Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL I

| EDWIN FRANQUI MARRERO<br><br>Peticionario<br><br>V.<br><br>DEPARTAMENTO DE CORRECCIÓN Y REHABILITACIÓN<br><br>Recurrido | KLRA202300581 | Revisión Administrativa procedente de la Negatoria de Programa de Pre-Reinserción a la Libre Comunidad<br><br>Núm. De Confinado: 6-54702<br><br>Sobre:<br>Revisión Administrativa |

Panel integrado por su presidente, el Juez Sánchez Ramos, Juez Pagán Ocasio y el Juez Marrero Guerrero.

Marrero Guerrero, juez ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 29 de enero de 2024.

Comparece por derecho propio y de forma *pauperis* ante este Tribunal el Sr. Edwin Franqui Marrero (en adelante, señor Franqui Marrero o peticionario), quien se encuentra confinado bajo la custodia del Departamento de Corrección y Rehabilitación (en adelante, DCR o parte recurrida). Solicita que revoquemos la *Evaluación Programa de Pre-Reinserción [a la Libre Comunidad]* emitida por el DCR el 17 de agosto de 2023 y notificada el 26 de septiembre de 2023.[1] Mediante dicha resolución, la parte recurrida denegó al peticionario participar del *Programa de Pre-Reinserción a la Libre Comunidad,* debido a la inviabilidad del hogar propuesto.

Por los fundamentos que expondremos a continuación, *confirmamos* la determinación del DCR. Explicamos.

**I.**

El 9 de febrero de 2023, la parte recurrida remitió a investigación el plan de salida presentado por el señor Franqui

---

[1] Apéndice del *Escrito en cumplimiento de resolución* del DCR, Anejo 1, pág. 10.

Marrero con el fin de participar en el *Programa de Pre-Reinserción a la Libre Comunidad* (en adelante, Programa) del DCR.[2] Como parte de este procedimiento, el DCR llevó a cabo una evaluación de la viabilidad del hogar propuesto por el señor Franqui Marrero, destinado para el disfrute de pases extendidos en la libre comunidad y pernoctar regularmente con sus familiares. La residencia incluida en el plan de salida del peticionario se encuentra ubicada en el Barrio Maleza del municipio de Mayagüez. El DCR también recibió el insumo de las víctimas de los delitos por los cuales el señor Franqui Marrero se encuentra confinado. Además, examinó un informe que detalla la participación del peticionario en las terapias *Aprendiendo a Vivir sin Violencia*.

Así las cosas, el 3 de marzo de 2023, el DCR suscribió el *Informe [de Investigación del] Programa Pre-Reinserción [a la libre comunidad]* (en adelante, Informe de Investigación).[3] En síntesis, la parte recurrida detalló en dicho informe que: (1) el señor Franqui Marrero propuso el hogar de su hermano, el señor David Franqui Marrero; (2) al investigar el hogar propuesto por el peticionario, el mismo está siendo ocupado únicamente por la señora Verónica Martínez Vizcarrondo; (3) la señora Martínez Vizcarrondo es excuñada del señor Franqui Marrero, tiene cincuenta y tres (53) años y es paciente de desprendimiento de la retina; (4) el hermano del peticionario se encuentra cumpliendo pena de cárcel por varios delitos, incluyendo cargos bajo la Ley Núm. 54 de 1989, conocida como la Ley para la Prevención e Intervención con la Violencia Doméstica, donde la persona perjudicada en el caso fue, precisamente, la señora Martínez Vizcarrondo; y (5) los ingresos mensuales del hogar son de $1,730.00, mientras que los gastos

---

[2] *Íd.*, Anejo 1, págs. 1-2.
[3] *Íd.*, págs. 7-8.

ascienden a $555.00, contemplando únicamente el canon de alquiler de la propiedad y los servicios esenciales.

En cuanto a la opinión de la señora Martínez Vizcarrondo sobre la residencia propuesta por el peticionario, según el Informe de Investigación, se determinó que ella accedió a recibirlo en su hogar a pesar de no conocerlo personalmente. La señora Martínez Vizcarrondo expresó su deseo de que el peticionario sea liberado de la institución carcelaria con una alguna oportunidad de empleo para que solo regrese al hogar a dormir. También expuso que necesitaría que el señor Franqui Marrero se hiciera cargo de sus gastos y se encargara de mantener ordenado el espacio que ocupara.[4] En cambio, la opinión de la comunidad fue mixta, ya que algunas personas expresaron su oposición debido a la naturaleza de los delitos y otras se mantuvieron neutrales.[5]

El 10 de febrero de 2023, el DCR emitió una *Certificación de Notificación* [*a las víctimas de delito*]. En esta, detalló que las reacciones de las personas que fueron víctimas de los delitos cometidos por el señor Franqui Marrero, ante la posibilidad de que el peticionario participara del Programa, fueron similares a la de los vecinos de la comunidad de Mayagüez.[6]

De igual manera, el DCR elaboró el *Informe Final de Ajuste y Progreso de Terapias* donde especificó que la experiencia del señor Franqui Marrero fue positiva, alcanzando un índice de progreso final de ochenta y tres (83).[7] Este índice fue considerado "bueno" en la evaluación del peticionario.

Finalmente, el 17 de agosto de 2023, el DCR emitió el *Resumen Evaluación [del] Programa de Pre-Reinserción [a la Libre Comunidad]* mediante el cual declaró "no favorable" la admisión del

---

[4] *Íd.*, pág. 7.
[5] *Íd.*, pág. 8.
[6] *Íd.*, pág. 4.
[7] *Íd.*, págs. 5-6.

señor Franqui Marrero al Programa.[8] El DCR fundamentó esa decisión en la ausencia de evidencia en el expediente administrativo que indique que el peticionario no constituiría un riesgo para su propia seguridad, la de posibles compañeros, la de la comunidad donde compartiría regularmente con su familia o la de las víctimas de los delitos por los cuales fue condenado. Además, el DCR particularizó que "[d]e la investigación realizada por el Negociado de Comunidad se desprende que el [h]ogar [propuesto] no es viable".[9]

Inconforme con la decisión, acude el peticionario ante este foro y alega que la decisión fue irrazonable. Sostiene que su excuñada es una persona íntegra y moral, sin antecedentes penales, mayor de edad y dispuesta a brindar apoyo en su reintegración a la libre comunidad. Respecto a los vecinos, afirmó que estos no lo conocen personalmente y sugiere que cualquier preocupación sobre el riesgo que pueda representar su presencia en la comunidad debe ser respaldada por evidencia documentada. Asegura que la residencia cuenta con servicios básicos como agua, luz y telefonía, además de contar con una habitación asignada para él. Asimismo, niega la presencia de personas de dudosa reputación en la residencia o la operación de negocios de venta de bebidas alcohólicas en sus cercanías. Por último, destaca que las víctimas de los delitos por los cuales fue condenado residen en municipios diferentes al hogar propuesto en su plan de salida. En consecuencia, solicita que revoquemos la decisión administrativa impugnada y ordenemos una reevaluación imparcial y justa.

Por su parte, en su comparecencia el DCR sostuvo que la negativa de no permitir la participación del señor Franqui Marrero en el Programa se fundamenta en la inviabilidad del hogar propuesto

---

[8] *Íd.*, págs. 9-10. Cabe señalar que, el dictamen fue notificado al peticionario el 26 de septiembre de 2023.
[9] *Íd.*

en su plan de salida. Afirma que el peticionario carece de evidencia sustancial en el expediente administrativo que tienda a rebatir la presunción de corrección y legalidad que respalda la decisión administrativa.

Con el beneficio de la comparecencia de ambas partes, procedemos a detallar la normativa aplicable en este caso. Veamos.

**II.**

Es norma conocida que los tribunales apelativos debemos otorgar amplia deferencia a las decisiones emitidas por las agencias administrativas, puesto que estas cuentan con vasta experiencia y pericia para atender aquellos asuntos que se les han sido delegados por la Asamblea Legislativa. *Oficina de Ética Gubernamental v. Martínez Giraud*, 210 DPR 79, 88-89. (2022); *Super Asphalt v. AFI y otros*, 206 DPR 803, 819 (2021); *Graciani Rodríguez v. Garaje Isla Verde*, 202 DPR 117, 126 (2019); *Rolón Martínez v. Supte. Policía*, 201 DPR 26, 35 (2018); *Torres Rivera v. Policía de PR*, 196 DPR 606, 626 (2016); *Asoc. Fcias. v. Caribe Specialty et al. II*, 179 DPR 923, 940 (2010). Por estas razones, dichas determinaciones suponen una presunción de legalidad y corrección, que a los tribunales nos corresponde respetar, mientras la parte que las impugne no presente prueba suficiente para derrotarlas. *Oficina de Ética Gubernamental v. Martínez Giraud, supra*; *Batista, Nobbe v. Jta. Directores*, 185 DPR 206, 216 (2012). No obstante, tal norma no es absoluta, por lo que nuestro Máximo Foro ha enfatizado que no podemos imprimirle un sello de corrección, so pretexto de deferencia, a las determinaciones administrativas que sean irrazonables, ilegales o contrarias a derecho.

Por esa misma línea, en *Torres Rivera v. Policía de Puerto Rico*, 196 DPR 606, 628 (2016), nuestro Tribunal Supremo resumió las normas básicas en torno al alcance de la revisión judicial de la forma siguiente:

*Los tribunales deben deferencia a las decisiones de una agencia administrativa, pero tal deferencia cederá cuando: (1) la determinación administrativa no está basada en evidencia sustancial; (2) el ente administrativo erró en la aplicación o interpretación de las leyes o reglamentos que se le ha encomendado administrar; (3) el organismo administrativo actuó arbitraria, irrazonable o ilegalmente, realizando determinaciones carentes de una base racional, o (4) la actuación administrativa lesionó derechos constitucionales fundamentales. Es importante destacar que si el tribunal no se encuentra frente a alguna de esas situaciones, aunque exista más de una interpretación razonable de los hechos procede que se valide la interpretación que realizó la agencia administrativa recurrida.*

Del mismo modo, la Sec. 4.5 de la Ley Núm. 38 del 30 de junio de 2017, 3 LPRA 9675, conocida como la Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico (LPAU), estableció el marco de revisión judicial de las agencias administrativas. *Rolón Martínez v. Supte. Policía, supra.* La intervención del tribunal se limita a tres áreas, a saber: (1) si el remedio concedido por la agencia fue apropiado; (2) si las determinaciones de hecho que realizó la agencia están sostenidas por evidencia sustancial que obra en el expediente administrativo visto en su totalidad, y (3) si las conclusiones de derecho del ente administrativo fueron correctas. *Íd.*; *Oficina de Ética Gubernamental v. Martínez Giraud, supra*; *Torres Rivera v. Policía de PR, supra*; *Nobbe v. Jta. Directores, supra*; Sec. 4.5 de la LPAU, 3 LPRA sec. 9675. Por lo tanto, aquellas determinaciones de hechos formuladas por el ente administrativo deberán sostenerse cuando estén basadas en evidencia sustancial que surja del expediente administrativo considerado en su totalidad. *Oficina de Ética Gubernamental v. Martínez Giraud, supra*; *Super Asphalt v. AFI y otros, supra*.

Ahora bien, las determinaciones de derecho pueden ser revisadas en su totalidad. *Rolón Martínez v. Supte. Policía*, supra, pág. 36; *Torres Rivera v. Policía de PR*, supra, pág. 627; Sec. 4.5

LPAU, 3 LPRA sec. 9675. No obstante, los tribunales deberán darles peso y deferencia a las interpretaciones que la agencia realice de aquellas leyes particulares que administra. *Rolón Martínez v. Supte. Policía, supra*; *Torres Rivera v. Policía de PR, supra.* Esto, pues el Tribunal Supremo ha dispuesto que la deferencia que le deben los tribunales a la interpretación que haga el ente administrativo sobre aquellas leyes y reglamentos que le corresponde poner en vigor, cede si la agencia: (1) erró al aplicar la ley; (2) actuó arbitraria, irrazonable o ilegalmente, o (3) lesionó derechos constitucionales fundamentales. *Íd*; *Oficina de Ética Gubernamental v. Martínez Giraud, supra.*

Finalmente, destacamos que el criterio administrativo no podrá prevalecer en aquellas instancias donde la interpretación estatutaria realizada por una agencia provoque un resultado incompatible o contrario al propósito para el cual fue aprobada la legislación y la política pública que promueve. Lo anterior ya que la deferencia judicial al *expertise* administrativo, concedido cuando las agencias interpretan la ley, tiene que ceder ante actuaciones que resulten irrazonables, ilegales o que conduzcan a la comisión de una injusticia. *Íd.*

**B.**

La Constitución del Estado Libre Asociado de Puerto Rico establece como política pública del Estado la reglamentación de las instituciones penales con el objetivo de facilitar la rehabilitación moral y social. Artículo IV, Sec. 19, LPRA Tomo I**.** Para dar cumplimiento a este mandato, la Asamblea Legislativa otorgó al Secretario o la Secretaria del Departamento de Corrección y Rehabilitación (DRC), entre otras atribuciones, la autoridad para adoptar, establecer, desarrollar e implementar reglas, reglamentos, órdenes, manuales, normas y procedimientos, con el propósito de supervisar el funcionamiento eficaz del Departamento y de los

programas y servicios que ofrece. Plan de Reorganización del Departamento de Corrección y Rehabilitación de 2011, según enmendado, 3 LPRA Ap. XVIII, Art. 7 (aa).

En virtud de lo anterior, el DCR implementó el Programa de Pre-Reinserción a la Libre Comunidad (Programa). A través de dicho programa, los miembros de la población correccional convivirían en una facilidad correccional, experimentando un ambiente similar a las condiciones que enfrentarían al reintegrarse a la libre comunidad. OA-DCR-2018-07, pág. 5. Asimismo, el enfoque principal del Programa es proporcionar a las personas recluidas oportunidades laborales, programas educativos o de tratamientos, así como promover el desarrollo de habilidades que faciliten su reintegración en la sociedad. *Íd.*

Como parte de la evaluación de los candidatos al Programa, se recoge el insumo de las víctimas de los delitos por los cuales fueron sentenciados. *Íd.,* págs. 13 y 19-22. Además, se recopila información confiable que evidencie que el miembro de la población correccional no representa un riesgo para su propia seguridad, la de sus compañeros, la comunidad y las víctimas o partes perjudicadas. *Íd.,* págs. 9-10.

Con el propósito de ingresar al Programa, la persona confinada suscribirá un contrato con el DCR, mediante el cual se comprometerá a cumplir con las condiciones que le sean impuestas. *Íd.*, págs. 10-11. En este contexto, cualquier violación por parte del miembro de la población correccional a las condiciones impuestas resultará en su reingreso a prisión para cumplir con el resto de su condena. *Íd.*

Además, como parte integral del Programa, las personas que se encuentran confinadas podrían beneficiarse de pases de salida para compartir con sus familiares. *Íd.,* pág. 32. Esta alternativa abarca la posibilidad de que los participantes del Programa

pernocten fuera de la institución penal. Por lo tanto, cada candidato es evaluado de acuerdo con el Reglamento Núm. 7595 del DCR del 28 de octubre de 2008, Reglamento para la Concesión de Permisos a los Miembros de la Población Correccional para Salir a Residir Fuera de las Institucionales Correccionales (Reglamento Núm. 7595). *Íd.* Este cuerpo reglamentario también establece la necesidad de realizar una investigación de campo para cotejar la disponibilidad e idoneidad del hogar propuesto para las visitas familiares. Reglamento Núm. 7595, Art. VIII. A.1.b, *supra.* Este proceso investigativo implica obtener la opinión de los vecinos del hogar propuesto, así como de las víctimas o partes perjudicadas.

Por último, es importante destacar que, la supervisión fuera de la institucional carcelaria de los participantes del programa se llevará a cabo a través del mecanismo de supervisión electrónica, la cual será sufragada por el participante **o por sus familiares.** *Íd.,* págs. 10 y 15. De igual forma, estas personas serán sometidas periódicamente a pruebas de dopaje, las cuales serán costeadas por el participante del Programa **o por sus familiares.** *Íd.*, págs. 15-16.

**III.**

En el presente caso, debemos determinar si el DCR incidió al denegarle al peticionario participar del *Programa de Pre-Reinserción a la Libre Comunidad*, debido a la inviabilidad del hogar propuesto.

Es harto conocido que los Tribunales debemos ser deferentes en torno a las decisiones administrativas, pero tal deferencia cederá cuando la determinación no esté basada en evidencia sustancial, cuando el ente administrativo haya errado en la aplicación de la ley y cuando la actuación resulte arbitraria, irrazonable e ilegal. *Torres Rivera v. Policía de Puerto Rico*, supra. Sin embargo, tras una evaluación exhaustiva del expediente bajo nuestra consideración y de la normativa aplicable al caso, no encontramos razones que justifiquen renunciar a la deferencia otorgada a la decisión

administrativa. En consecuencia, llegamos a la conclusión de que el DCR no incidió en su decisión. Explicamos a continuación.

Según se desprende del Informe de Investigación, la señora Martínez Vizcarrondo **no conoce personalmente al señor Franqui Marrero**.[10] Este escenario llama la atención, ya que no es común ni razonable abrir las puertas del hogar, para residir bajo el mismo techo, a personas a quienes desconocemos. Además, al poner a disposición su hogar, la señora Martínez Vizcarrondo estaría aceptando ciertas responsabilidades estipuladas por el Programa con respecto al señor Franqui Marrero, **a pesar de no conocerlo personalmente**. Esto suscita dudas sobre si la señora Martínez Vizcarrondo podría realmente asumir la responsabilidad que implica supervisar al peticionario y cubrir todos aquellos gastos que, por alguna razón, este no pueda sufragar.

En otra instancia, se desprende del Informe de Investigación que, la señora Martínez Vizcarrondo enfrentó problemas legales con el hermano del peticionario bajo la Ley Núm. 54 de 1989. El DCR podía razonablemente concluir, al evaluar todo lo antes mencionado, que el hogar propuesto por el peticionario no era viable.

**IV.**

Por los fundamentos que anteceden, confirmamos la determinación administrativa notificada por el DCR al señor Franqui Marrero.

Lo acuerda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[10] *Íd.*, pág. 7.